UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

SUSAN A. SAM                              CIVIL ACTION NO. 6:20-cv-00658

VERSUS                                    JUDGE JUNEAU

COMMISSIONER OF THE SOCIAL                MAGISTRATE JUDGE HANNA
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the parties' arguments, and the applicable

law, it is recommended that the Commissioner's decision should be affirmed.

## Administrative Proceedings

The claimant, Susan A. Sam, fully exhausted her administrative remedies

before initiating this action.  She filed applications for disability insurance benefits

("DIB") and supplemental security income benefits ("SSI"), alleging disability

beginning on December 27, 2017.[1]  After her applications were denied,[2] a hearing

was held before Administrative Law Judge Devona Futch Able.[3]  The ALJ issued a

decision on July 5, 2019, concluding that Ms. Sam was not disabled within the

---

[1]     Rec. Doc. 12-1 at 160, 168.

[2]     Rec. Doc. 12-1 at 65, 67.

[3]     A transcript of the hearing is found in the record at Rec. Doc. 12-1 at 30-64.

meaning of the Social Security Act from the alleged disability onset date through the date of the decision.[4]  Ms. Sam asked the Appeals Council to review the ALJ's decision, but the Appeal Council found no basis for review.[5]  Therefore, the ALJ's decision became the Commissioner's final decision.[6]  Ms. Sam then initiated this action, seeking judicial review of the Commissioner's decision.

## Summary of Pertinent Facts

Ms. Sam was born on November 18, 1967.[7]  At the time of the ALJ's decision, she was fifty-one years old.  She completed the tenth grade[8] and has relevant work experience providing home health care for elderly persons,[9] equivalent to that of a certified nurse assistant or home attendant.[10]  She alleged that she became disabled on December 27, 2017 due to rheumatoid arthritis, high blood pressure, a stroke, chronic obstructive pulmonary disease ("COPD"), asthma, depression, hernia, back pain, stomach ulcer, and carpal tunnel syndrome.[11]

---

[4]     Rec. Doc. 12-1 at 15-24.

[5]     Rec. Doc. 12-1 at 5.

[6]     *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005).

[7]     Rec. Doc. 12-1 at 37.

[8]     Rec. Doc. 12-1 at 39.

[9]     Rec. Doc. 12-1 at 40-41, 57-59, 202, 222.

[10]    Rec. Doc. 12-1 at 61.

[11]    Rec. Doc. 12-1 at 70, 78, 160, 168.

In December 2015, Ms. Sam went to the emergency room at Savoy Medical Center for chest pain and was diagnosed with an enlarged heart,[12] as confirmed by chest x-ray in April 2016.[13]  She treated with Dr. Francisco N. Cantu on several occasions in 2016 for a variety of ailments including but not limited to leg pain, bronchitis, hypertension, epigastric pain, anxiety, depression, and chest pain.[14]

In April 2016, she was treated at University Hospital and Clinics ("UHC") after having had chest pain and shortness of breath for about three months.[15]  She gave a history of hypertension, chronic pain, allergies, anxiety, depression, acid reflux, and chest pain.  Although the doctors' impression was that her chest pain was likely not cardiac in nature, they recommended an echocardiogram and cardiac stress test due to her chronic cough and dyspnea on exertion.  They also noted that her high blood pressure was uncontrolled.  Because she was taking inconsistent medications, they suggested a medication reconciliation session with her primary care physician.

In August 2016, Dr. Cantu diagnosed Ms. Sam with COPD.[16]  Chest x-rays taken on August 3 and 6, 2016 showed bilateral rib fractures, with no active

---

[12]    Rec. Doc.12-1 at 439, 443-451.

[13]    Rec. Doc. 12-1 at 400.

[14]    Rec. Doc. 12-1 at 408-410, 413-419.

[15]    Rec. Doc. 12-1 at 585-586.

[16]    Rec. Doc. 12-1 at 382.

cardiopulmonary disease and no history of trauma.[17]  Dr. Cantu certified that Ms. Sam was under his care from August 8 to August 10, 2016 and was able to return to work with no restrictions thereafter.[18]  A progress note from August 9, 2016, confirmed that she had no work restrictions due to her fractured ribs.[19]  A total body bone scan on August 17, 2016 again showed acute fractures bilaterally in Ms. Sam's ribs and also showed degenerative changes in her shoulders and knees.[20]  On August 24, 2016,[21] she was seen for a cough and complaints of leg pain.  Dr. Cantu's impressions were fractured bilateral ribs and osteoarthritis in her shoulder.  When an abdominal ultrasound obtained on August 26, 2016 showed hepatomegaly (an abnormal enlargement of the liver) and cholelithiasis (gallstones), further testing was recommended.[22]  Ms. Sam returned to see Dr. Cantu on August 30, 2016 for a rash.[23]  His impressions at that time were asthma and allergies, and he referred her to another doctor for a lupus panel.

---

[17]     Rec. Doc. 12-1 at 456, 460.

[18]     Rec. Doc. 12-1 at 402.

[19]     Rec. Doc. 12-1 at 383.

[20]     Rec. Doc. 12-1 at 657.

[21]     Rec. Doc. 12-1 at 380.

[22]     Rec. Doc. 12-1 at 328.

[23]     Rec. Doc. 12-1 at 379.

In September 2016, Ms. Sam saw Dr. Nicholas Lahaye at the Vidrine Community Clinic for evaluation of left leg pain.[24]  She was positive for chest pain and pedal edema, abdominal pain, polyuria, chronic back pain, and weakness in both legs.  Dr. Lahaye's impressions were leg pain, acute gastritis, hypertension, smokers' syndrome, lower back pain, and COPD.  He prescribed Tramadol for her pain.

Ms. Sam followed up at the Vidrine Clinic in October 2016.[25]  The Tramadol had not helped, and her symptoms seemed to be worsening.  She reported that she had seen a cardiologist about eight months previously but had not gone back.  She was positive for dizziness, palpitations, pedal edema, tachycardia, and varicosities. She was also positive for chronic cough and frequent wheezing, headaches, paresthesia, excessive thirst and hunger, crying spells, depression, stress, anhedonia, mood swings, sadness, and insomnia.  It was noted that she seemed to be in moderate pain; she was wheezing; and she had a decreased range of motion with extension and adduction of the left hip, pain with left hip flexion, extension, and adduction, crepitus, tenderness, and effusions as well as tenderness in her left low back.  Her mood was depressed.  Diagnostic testing was ordered.  The assessments were intermittent claudication (leg cramping), hypertension, smokers' syndrome, low

---

[24]     Rec. Doc. 12-1 at 296-299.

[25]     Rec. Doc. 12-1 at 290-295.

back pain, COPD, leg pain, cholelithiasis (gallstones), left ventricular hypertrophy, and ankle pain.  Medications were prescribed.

On October 11, 2016, an arterial ultrasound of Ms. Sam's left leg showed mild, diffuse atherosclerotic disease,[26] while a venous ultrasound was normal.[27]  An MRI of her lumbar spine, obtained a few days later, showed disc herniations at L3-4 and L5-S1 with multilevel facet arthropathy.[28]

On October 31, 2016, Ms. Sam saw Dr. Andrew J. Minardi, Jr. for complaints of gallbladder disease and right upper quadrant abdominal pain.[29]  She admitted drinking a significant amount daily.  Dr. Minardi diagnosed gallstones, enlargement of the liver, and alcohol dependence as well as possible hepatitis or cirrhosis.  He strongly urged Ms. Sam to stop drinking.  On November 8, 2016, he removed her gallbladder and biopsied her liver.[30]

When Ms. Sam followed up with Dr. Lahaye in November 2016 concerning her left leg pain,[31] her Neurontin prescription was refilled.  She returned to Dr.

---

[26]     Rec. Doc. 12-1 at 317.

[27]     Rec. Doc. 12-1 at 490.

[28]     Rec. Doc. 12-1 at 493.

[29]     Rec. Doc. 12-1 at 503-506.

[30]     Rec. Doc. 12-1 at 500-502.

[31]     Rec. Doc. 12-1 at 286-289.

Lahaye in January 2017, complaining of a headache and left leg pain that increased when she walked. Her medications were adjusted. She followed up with Dr. Lahaye concerning hypertension in March 2017.[32]

In April 2017, Ms. Sam was seen in the emergency room at Savoy Medical Center for a throbbing left-side headache.[33] She was again prescribed Tramadol and advised to rest in a dark room. She was excused from work for one day.

When Ms. Sam saw Dr. Cantu in May 2017,[34] she complained of worsening right hip pain. She was in mild distress and limping. Dr. Cantu's impression was arthritis in the right hip as well as low back pain due to facet arthropathy. X-rays of Ms. Sam's hips showed lumbrosacral spondylosis but no acute osseous defect, and a rheumatoid factor test was negative.[35]

In June 2017, Ms. Sam was seen in the emergency room at Savoy Medical Center because of coughing.[36] She was given a steroid injection and an antibiotic prescription and discharged home with instructions to resume her normal activities.

---

[32]    Rec. Doc. 12-1 at 513.

[33]    Rec. Doc. 12-1 at 516-523.

[34]    Rec. Doc. 12-1 at 350-353.

[35]    Rec. Doc. 12-1 at 525, 526.

[36]    Rec. Doc. 12-1 at 527-534.

In July 2017, Ms. Sam saw Dr. Cantu regarding headaches, back pain, and leg pain.[37]  His impressions were hypertension, lumbar radiculopathy, herniated discs, and asthma.  He noted that an MRI showed neural foraminal stenosis worse on the left at L4-L5.  He adjusted her medications and advised her to have orthopedic and neurologic evaluations.

Ms. Sam went to the emergency room at Savoy Medical Center on August 18, 2017,[38] complaining of dizziness, generalized weakness, vomiting, abdominal pain, memory lapses, and facial numbness.  She gave a history of having had a stroke with no residual deficits.  The doctor's assessment was hypomagnesemia (an electrolyte disturbance caused by a low level of serum magnesium in the blood), trichomonas (a sexually transmitted disease), dehydration, and generalized weakness.  She was admitted to the hospital for hydration and treatment of the STD.

A year later, on August 19, 2018, Ms. Sam was seen in the emergency room at Savoy Medical Center for right foot and ankle pain following a fall on a slip-and-slide.[39]  X-rays showed a nondisplaced spiral fracture through the distal right fibula, a medial malleolar fracture, calcaneal spur, and soft tissue swelling.[40]

---

[37]     Rec. Doc. 12-1 at 340-343.

[38]     Rec. Doc. 12-1 at 538-540, 543-550.

[39]     Rec. Doc. 12-1 at 557-578.

[40]     Rec. Doc. 12-1 at 560.

On September 10, 2018, Ms. Sam saw Dr. Michael J. Schutte and Dr. Ryan Dewitz at UHC.[41]  She explained that, although bearing weight on her fractured foot was painful, she could not avoid putting weight on her foot because she had to care for her mother.  Her ankle was moderately swollen and tender to palpation, but muscular function and pulses were intact.  Surgery was recommended, but it would require a period of non-weight-bearing thereafter.  Ms. Sam declined surgery, her foot was placed in a cast, and she was advised to stop smoking.  She was to return for repeat x-rays to ensure no shift in alignment of the fractured bones.

When Ms. Sam returned to UHC on October 10, 2018,[42] x-rays showed fracture subsidence and callus formation with interval healing since the previous x-rays.  The treatment note indicated that a long discussion was held regarding nonoperative management of the fractures due to Ms. Sam's need to care for her mother, including the high likelihood of post-traumatic arthritis and joint pain after healing.  The doctors stated that future surgery, including a possible fusion, might be necessary, and Ms. Sam indicated that she understood the risks associated with both operative and nonoperative management of her condition.  Dr. Shutte stated that a nonoperative treatment plan was reasonable and appropriate.  Ms. Sam was placed in a short cast and was to return in six weeks for repeat x-rays.

---

[41]     Rec. Doc. 12-1 at 583-584, 620.

[42]     Rec. Doc. 12-1 at 587-589.

Ms. Sam's cast was removed at UHC on December 14, 2018.[43]  New x-rays showed a well-healed fibular fracture with significant callus formation, but the distal medial malleolus transverse fracture showed no interval healing with sclerotic change evident.  Ms. Sam transitioned to a boot that day and was to begin weight bearing as tolerated with very slow progression out of the boot over two to four weeks.  She was given a prescription for physical therapy to work on range of motion and strengthening her right leg.  A long discussion was held regarding the possible need for future surgery and potential arthritic changes.

In March 2019, Ms. Sam saw Dr. John Fontenot at Savoy Medical Center for medication refills.[44]  She complained of increased shortness of breath, pain to the left side of her chest, body aches, fatigue, and back pain.  It was noted that she had a decreased range of motion in her right leg.  She was to follow a low fat, low salt diet and avoid strenuous activity.  She was prescribed medications, and further diagnostic testing was ordered.

On May 21, 2019, Ms. Sam testified at a hearing regarding her impairments.  She testified that she rode a scooter in the grocery store and sat down in a portable wheelchair to cook and do dishes.  She stated that she did not sweep or mop.  She explained that her driver's license had expired and she no longer drove.

---

[43]    Rec. Doc. 12-1 at 634-638.

[44]    Rec. Doc. 12-1 at 680-687, 706.

Ms. Sam testified that she was continuing to have problems with her right foot and ankle. She confirmed that her doctor recommended surgery on her foot, but she declined it because she was caring for her mother. Although that impediment to surgery had resolved with her mother's death, Ms. Sam continued to decline surgery over concerns about who would care for her after the surgery if she decided to proceed with it.

She testified that she fell frequently, especially after walking a distance. She stated that she was receiving treatment for her knees and was taking muscle relaxers as well as ibuprofen and Tramadol for pain. She also stated that she used a wrap for her knees. She confirmed that physical therapy had been recommended, but it was unclear whether she was receiving physical therapy. She stated that her hands cramped when the weather was cold, but she had no trouble using them.

Ms. Sam testified that her breathing problems prevented her from sleeping laying down and required her to use an Anoro inhaler twice a day. She was still smoking approximately half a pack of cigarettes per day. She confirmed that she took Clonidine, which caused her to be tired and sleepy. She stated that she had right-sided back pain from disc problems caused by coughing. She said that she took medication for swelling, although she did not identify the drug. She stated that she was in pain during the hearing, and she rated it at ten-and-a-half. She attributed the severity of her pain to the forty-five minute car ride to the hearing. She stated that

her legs felt like they wanted to pop out of place. She stated that her leg pain was constant but improved when she took her medicine and when she lay down. She further stated that she could not take the medicine constantly because "I would sleep all the time and couldn't control my, my life."[45] She denied having any mental health problems and stated that she had recently stopped drinking alcohol.

Ms. Sam testified that she was able to lift and carry ten or fifteen pounds and could be on her feet for about thirty minutes before the pain required her to sit down for a little while. She stated that she was unable to sit for very long because her body became agitated and she had to move around. She attributed this to pain. She stated that she could sit for approximately thirty minutes before needing to move. She stated that she had trouble getting in the bathtub and on the toilet, so she used a walker for assistance with those tasks. She testified that, during the day, she cleaned her house, did laundry, cooked, and washed dishes but did not sweep, mop, clean bathrooms, or do yard work. She stated that someone always accompanied her to the grocery store, but she did not attend church or social activities. She stated that she read a lot and cared for her mentally disabled son.

Ms. Sam explained that when she was working, she cared for her father and then her mother through her employer, Heaven on Earth Network. Her work duties

---

[45]    Rec. Doc. 12-1 at 50.

included light housekeeping, preparing meals, making sure they took their medications, scheduling their doctors' appointments, and attending their doctors' appointments with them.

Ms. Sam now seeks reversal of the Commissioner's adverse ruling.

## Analysis

### A.    Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[46] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[47] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[48]

---

[46]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[47]    *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[48]    *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[49]   In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[50]   Conflicts in the evidence[51] and credibility assessments[52] are for the Commissioner to resolve, not the courts.   Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:   (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education, and work experience.[53]

## B.   <u>Entitlement to Benefits</u>

The DIB program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled,

---

[49]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[50]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[51]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[52]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[53]    *Wren v. Sullivan*, 925 F.2d at 126.

regardless of indigence.[54]  The SSI program provides income to disabled individuals who meet certain income and resource requirements.[55]

A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[56]  A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[57]

## C.    **Evaluation Process and Burden of Proof**

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled, which considers whether the claimant (1) is currently engaged in substantial gainful activity; (2) has a severe impairment; (3) has an impairment

---

[54]    See 42 U.S.C. § 423(a).  See, also, *Smith v. Berryhill*, 139 S.Ct. 1865, 1772 (2019).

[55]    42 U.S.C. § 1382(a)(1) & (2).  See, also, *Smith v. Berryhill*, 139 S.Ct. at 1772.

[56]    42 U.S.C. § 1382c(a)(3)(A).

[57]    42 U.S.C. § 1382c(a)(3)(B).

enumerated in the relevant regulations; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[58]  Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity[59] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[60]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[61]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[62]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[63]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to

---

[58]     20 C.F.R. § 404.1520; *Garcia v. Berryhill*, 880 F.3d 700, 704 (5th Cir. 2018).

[59]     20 C.F.R. § 404.1520(a)(4).

[60]     20 C.F.R. § 404.1545(a)(1).

[61]     20 C.F.R. § 404.1520(e).

[62]     *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[63]     *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

rebut this finding.[64]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[65]

## D.    The ALJ's Findings and Conclusions

In this case, the ALJ determined, at step one, that Ms. Sam has not engaged in substantial gainful activity since December 27, 2017, the alleged disability onset date.  This finding is supported by substantial evidence in the record.

At step two, the ALJ found that Ms. Sam has the following severe impairments:  degenerative changes in the shoulders and knees; degenerative changes of the lumbar spine at L3-4 and L5-S1; rheumatoid arthritis; asthma; calcaneal spur; healing fracture of the right ankle; and obesity.  The claimant did not dispute this finding.

At step three, the ALJ found that Ms. Sam has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment. The claimant did not challenge this finding.

The ALJ found that Ms. Sam has the residual functional capacity to perform light work except that she can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps/stairs; can never climb ladders, ropes, or scaffolds; and needs to change

---

[64]    *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[65]    20 C.F.R. § 404.1520(a)(4); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

position for one to two minutes per hour without being off-task or away from the work station.  Ms. Sam challenged this finding.

At step four, the ALJ found that Ms. Sam is not capable of performing any past relevant work.  The claimant did not challenge this finding.

At step five, the ALJ found that Ms. Sam was not disabled from December 27, 2017 (the alleged disability onset date) through July 5, 2019 (the date of the decision) because there are jobs in the national economy that she can perform.  The claimant challenged this finding.

## E.    **The Allegations of Error**

The claimant argued that the ALJ erred in reaching a residual functional capacity finding that is not supported by substantial evidence in the record.

## F.    **The Residual Functional Capacity Finding**

A residual functional capacity assessment "is a determination of the most the claimant can still do despite his physical and mental limitations and is based on all relevant evidence in the claimant's record."[66]    The ALJ is responsible for determining a claimant's residual functional capacity.[67]    To do so, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the claimant's ability

---

[66]    *Perez v. Barnhart*, 415 F.3d at 462 (citing 20 C.F.R. § 404.1545(a)(1)).

[67]    *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).

despite any physical and mental limitations.[68]   The evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled.[69]   In making a residual functional capacity assessment, an ALJ must consider all symptoms and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.   The ALJ must consider the limitations and restrictions imposed by all of an individual's impairments, even those that are not severe.[70]

Ms. Sam argued that, in reaching her residual functional capacity finding, the ALJ "impermissibly relied on her own lay person opinion to formulate the RFC as there were no medical opinions as to how [her] impairments caused functional limitations contained in the record."[71]   She argued that the record contains insufficient evidence on which to base a residual functional capacity finding and further argued that the ALJ erred in failing to have her examined by a consulting

---

[68]   *Martinez v. Chater*, 64 F.3d at 176.

[69]   *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Loya v. Heckler*, 707 F.2d 211, 215 (5th Cir. 1983).

[70]   *Giles v. Astrue*, 433 Fed. App'x 241, 245 (5th Cir. 2011) (citing 20 C.F.R. § 404.1545).

[71]   Rec. Doc. 14 at 6.

physician and in failing to contact her treating physicians for additional information. This argument lacks merit.

In her briefing, the claimant focused in large part on the allegedly disabling nature of the healing fractures in her right foot. But her foot was fractured eight months after she claimed to have become disabled. Therefore, any limitations resulting from the fractured foot are not critical to the disability analysis in this case.

Ms. Sam is correct that the "ALJ owes a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts."[72] But an ALJ is not required to order a consultative examination at government expense "unless the record establishes that such an examination is necessary to enable the [ALJ] to make the disability decision."[73] Similarly, the ALJ is not required to recontact medical sources and request additional evidence.[74] In other words, if the record contains sufficient evidence for the ALJ to make an

---

[72]    *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (citing *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984)).

[73]    *Jones v. Bowen*, 829 F.2d 524, 526 (5th Cir. 1987) (quoting *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977)). See, also, 20 C.F.R. § 404.1520b(b)(2); 20 C.F.R. § 416.920b(b)(2); *Hardman v. Colvin*, 820 F.3d 142, 148 (5th Cir. 2016); *Hernandez v. Astrue*, 269 Fed. App'x 511, 515 (5th Cir. 2008).

[74]    20 C.F.R. § 404.1520b(b)(2); 20 C.F.R. § 416.920b(b)(2). See, also, *Jones v. Astrue*, 691 F.3d 730, 733 (5th Cir. 2012).

informed decision, the ALJ need not develop the record further.[75] The ALJ can evaluate a claimant's residual functional capacity even when the record does not contain a residual functional capacity assessment by a medical source.[76] "It is the ALJ's responsibility to determine a claimant's RFC, and such an assessment is not a medical opinion."[77] Additionally, the ALJ's duty to develop the record must be balanced against the fact that claimants bear the burden of proof with regard to the first four steps of the disability analysis.[78]

In this case, both of the state agency examiners concluded that the record lacked sufficient evidence for them to determine that Ms. Sam was disabled.[79] When they denied her claims on July 17, 2018, they noted that she had not returned work history and function forms and they were unable to reach her by telephone. However, the record contains the filled-out work history and function forms, which were dated July 9, 2018[80] and apparently arrived too late to be considered by the

---

[75] See *Hernandez v. Astrue*, 269 Fed. App'x at 515; *Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir. 1989).

[76] See *Joseph-Jack v. Barnhart*, 80 Fed. App'x 317, 318 (5th Cir. 2003).

[77] *Joseph-Jack v. Barnhart*, 80 Fed. App'x at 318.

[78] *Holifield v. Astrue*, 402 Fed. App'x 24, 26 (5th Cir. 2010) (citing *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007)).

[79] Rec. Doc. 12-1 at 73, 74, 76.

[80] The completed function report is actually dated July 9, 2017. Since Ms. Sam did not apply for benefits until March 2018 and since her work history form is dated July 9, 2018, this Court assumes that the date on the function report is an error.

state agency examiners. Because these forms are in the record, however, the ALJ had access to them, which means that the ALJ had information that was not available to the state agency examiners, and the deficiency noted by state agency examiners was cured before the ALJ made her decision.

Additionally, the "claimant has the burden of proof in establishing his disability."[81] More specifically, the claimant has the burden of proof to demonstrate what limitations should be included in the residual functional capacity assessment.[82] If the claimant does not provide sufficient evidence, the ALJ must make a determination based on the available evidence.[83] Here, the ALJ based her decision on the evidence in the record, which established that Ms. Sam has degenerative changes in her shoulders, knees, hips, and spine as well as asthma, COPD, high blood pressure, and other ailments. But the only opinions of her physicians as to her functionality are when Dr. Cantu released her to return to work without restrictions, when the UHC physicians accommodated her request for nonsurgical treatment of her fractured ankle, and the recent opinion that she was to avoid strenuous activity.[84]

---

[81]   *Anderson v. Sullivan*, 887 F.2d at 634.

[82]   *Guidry v. Social Security Administration*, No. 16-15252, 2017 WL 9362501, at *7 (E.D. La. Aug. 15, 2017) (citing *Greenspan v. Shalala*, 38 F.3d at 236), report and recommendation adopted, 2017 WL 5989056 (E.D. La. Dec. 4, 2017).

[83]   *Brumley v. Saul*, No. 4:20-cv-585, 2021 WL 1111045, at *3 (S.D. Tex. Mar. 23, 2021) (citing 20 C.F.R. § 404.1516.)

[84]   Rec. Doc. 12-1 at 517.

In her ruling, however, the ALJ cited to specific findings by Ms. Sam's treating physicians that might lead a reasonable person to conclude that Ms. Sam's functionality was not as severely impacted as she claims. The ALJ reviewed the findings of the claimant's treating physicians, acknowledged their diagnoses, found some of Ms. Sam's conditions to be severe, but also noted that evidence in the record suggests that the claimant retains significant functional abilities. The ALJ also relied on the written information supplied by Ms. Sam, her hearing testimony, and the testimony of the vocational expert. This Court finds that there was sufficient evidence in the record to allow the ALJ to validly evaluate Ms. Sam's residual functional capacity.

This is not a case in which the ALJ considered competing medical evidence and found that one doctor's opinion had a better foundation than that of another doctor, nor is it a case in which the ALJ rejected the opinions of the claimant's treating physician and substituted her own lay opinion. Instead, this is a case in which the ALJ considered the evidence in the record and drew a conclusion based on that evidence – including the treatment notes of the doctors who met with the claimant and evaluated her condition and the information supplied by the claimant herself. While none of the doctors expressly evaluated Ms. Sam's functionality, the information contained in their records was used by the ALJ to assess Ms. Sam's ability to function. The ALJ also found that Ms. Sam's estimate of her pain level at

the hearing was not credible. In a similar vein, although it was not noted by the ALJ in her ruling, there appears to be a one-year gap in treatment before Ms. Sam fractured her foot, and it is during that gap in treatment that she allegedly became disabled. These factors militate in favor of a finding that Ms. Sam is not disabled.

Furthermore, even if this Court were to find that the ALJ erred by failing to adequately develop the record, reversal of the ALJ's decision is not warranted unless the claimant shows that he or she was prejudiced by the ALJ's failure.[85] In this case, Ms. Sam did not establish that she was prejudiced by the alleged error. Prejudice is established "by showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision."[86] But a "mere allegation that beneficial evidence might have been gathered had the error not occurred is insufficient to meet this burden."[87] Ms. Sam did not identify any evidence that would have changed the ALJ's decision. Consequently, she made no particularized showing of prejudice and her supposition that something beneficial to her claim might have materialized from a consultative examination or in response to a request to her treating physicians for more

---

[85]    *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000).

[86]    *Jones v. Astrue*, 691 F.3d at 733-34 (citing *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000)).

[87]    *Jones v. Astrue*, 691 F.3d at 735.

information does not establish prejudice.  Thus, to the extent she complained that the ALJ erred by failing to develop the record, her argument lacks merit.[88]

In sum, Ms. Sam did not meet her burden of proof; she failed to present objective medical evidence that demonstrates that her ailments caused limitations more severe than those found by the ALJ in the residual functional capacity assessment.[89]  Therefore, there is no basis for reversing the ALJ's decision.

### **Conclusion and Recommendation**

For the foregoing reasons, this Court recommends that the Commissioner's decision should be AFFIRMED, and this matter should be dismissed with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within

---

[88]    See, e.g., *Brumley v. Saul*, 2021 WL 1111045, at *3; *Manzano v. Berryhill*, No. 4:16-CV-3496, 2018 WL 1518558, at *9 (S.D. Tex. Mar. 28, 2018).

[89]    See *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir.1995).

fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[90]

Signed at Lafayette, Louisiana, this 4th day of May 2021.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[90]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).